IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

DENNIS SHAPPIE,

                        Plaintiff,                    Case No. 3:09 CV 2777

      -vs-

                                              <u>MEMORANDUM  OPINION</u>

MINSTER MACHINE COMPANY
RESTATED NON-BARGAINING
EMPLOYEES' RETIREMENT PLAN

                        Defendant.

KATZ, J.

This matter is before the Court on cross-motions for judgment on the administrative record filed by Plaintiff, Dennis Shappie (Doc. 24), and by Defendant, The Minster Machine Company Restated Non-Bargaining Employees' Retirement Plan (Doc. 25) ("the Plan"). Defendant's motion will be granted and Plaintiff's denied.

**I. Background**

Plaintiff was hired by The Minster Machine Company ("Minster") on February 19, 1973. He worked for the company until he retired on May 31, 2009, at the age of 57. From October 1995 through November 2004, he worked on foreign assignment for Minster in Hong Kong. Plaintiff became a participant in the Plan on June 20, 1977. The current and applicable version of the Plan was last amended effective October 1, 1997.

Article III of the Plan sets forth the terms under which Minster employees become eligible for retirement benefits, and the manner in which monthly retirement benefits are calculated. A participant in the Plan who is at least fifty-five years old and who has been credited with ten or more years of service is eligible for early retirement benefits. With respect to employees like Plaintiff, who became participants in the Plan prior to October 1, 2002, "[s]uch Participant shall be

entitled to receive a Monthly Retirement Income equal to his Accrued Benefit as of his Early Retirement Date, reduced by one-one hundred eightieth (1/180) for each month by which the Participant's Early Retirement Date precedes his sixtieth (60th) birthday."

"Monthly Retirement Income" is calculated by the greater of: 1.2% of "Average Monthly Earnings" multiplied by the participant's "Credited Service," or $16.50 multiplied by "Credited Service." The phrase "Monthly Earnings" is defined in Section 1.31 of the Plan as "the Participant's regular monthly rate of earnings as reported for Form W-2 purposes divided by the applicable number of months in the calendar year." Section 1.07 of the Plan defines "Average Monthly Earnings" in relevant part as "the highest average of Monthly Earnings (as defined in this Article I) as determined for any sixty (60) consecutive months prior to the Participant's . . . Early Retirement Date."

The Plan is administered by the "Retirement Committee" ("the Committee"), which consists of three persons appointed by Minster's Board of Directors. The Plan contains no further standards as to the qualifications of the Committee. Section 5.03 of the Plan grants the Committee the authority to "interpret the Plan" and to "determine all questions arising in the administration, interpretation and application of the Plan." In addition, Section 12.01 of the Plan provides that "[a]ny rules, regulations, or procedures that may be necessary for the proper administration or functioning of this Plan that are not covered in this Plan or the Trust Agreement shall be promulgated and adopted by the Retirement Committee."

As part of its Expatriate Policy, Minster paid Plaintiff a housing allowance during his time on overseas assignment. In July 2008, Stephen Kill, a member of the Committee as well as Minster's Vice President-Human Resources, provided Plaintiff with a Retirement Calculation

Detail. This initial calculation counted the housing allowance as "Monthly Earnings" for the years ending 2002 through 2004, but not 1996 through 2001. On February 20, 2009, Kill provided Plaintiff with a revised Retirement Calculation Detail that excluded the housing allowance completely from the calculation of "Monthly Earnings." By correspondence dated April 4, 2009, Plaintiff requested a recalculation on the basis of his taxable compensation as shown on his W-2 form. He urged specifically that his housing allowance be included as part of his "Monthly Earnings."

In a letter dated May 4, 2009, the Committee responded to Plaintiff. The Committee indicated that it interpreted the phrase "Monthly Earnings," defined as the participant's "regular monthly rate of earnings as reported for Form W-2 purposes," to include Plaintiff's Base and 10% Foreign Assignment Bonus, Commodities and Services Allowances, Weekend and Holiday Pay, Vacation Adjustments, Travel Bonus Adjustments, and Health Insurance Premium Adjustments. The Committee also indicated that it interpreted the phrase "Monthly Earnings" to exclude airline tickets purchased for Plaintiff's family, lump sum tax equalization payments, and Plaintiff's housing allowance. The Committee recalculated Plaintiff's benefit on the basis of this interpretation.

By correspondence dated June 9, 2009, Plaintiff, through his attorney, appealed the Committee's benefit calculation, arguing again that his housing allowance should be included in the calculation of his "Average Monthly Earnings." In a six-page opinion issued August 7, 2009, the Committee upheld its previous calculation of Plaintiff's benefits, and in particular the exclusion of Plaintiff's housing allowance from the calculation of his "Monthly Earnings." Plaintiff argued that his housing allowance should be included in his "Monthly Earnings"

3

calculation for pension purposes because Barbara Smith, an Ernst & Young representative, had advised him in September 1995 that it would be. In its opinion, the Committee rejected this argument, claiming it was unable to find any evidence that Smith had made such a statement and noting that, in any event, Smith was not a Minster employee or a fiduciary of the Plan, and was not authorized to make representations on behalf of the Plan.

The Committee also rejected Plaintiff's arguments as to the proper interpretation of the phrase "Monthly Earnings." Plaintiff argued that, because the phrase "regular monthly rate of earnings" is not further defined in the Plan, the Committee should interpret "Monthly Earnings" to include all amounts reported as compensation on his Form W-2. The Committee found, however, that this interpretation would impermissibly "ignore[] the Plan language which requires that the earnings be the Participant's 'regular monthly rate of earnings.'"

In support of its own interpretation of "Monthly Earnings" as excluding the housing allowance, the Committee noted that Plaintiff was provided with an itemized summary of his compensation package, dated July 1, 1996, that showed the housing allowance as "Paid in Kind," and not as part of his pay. Statements dated January 1, 1997 and February 20, 1998 also did not reflect a dollar amount for the housing allowance, stating only that it was "Paid in Kind." Moreover, the Committee noted that Plaintiff had received a memo dated August 7, 1997 explaining that the housing allowance was not paid to him through payroll and was reported to him solely for payroll tax purposes. The memo also stated that the housing allowance was paid by Minster directly to an intermediary, United Asia. The Committee noted as well that the payments were based on the actual rent incurred by Plaintiff.[1]

---

[1] The Committee also explained that the earlier inconsistency in the benefit calculations provided to

The Committee pointed to Plaintiff's Form W-2s and Wage and Tax Statements for further support that the housing allowance was not considered part of Plaintiff's regular earnings. From 1996 through 2000, Plaintiff reported his housing allowance on a "Supplemental W-2," and it was listed in Box 12 of his Form W-2 as a "benefit included in Box 1," the box for "wages, tips, [and] other compensation." While Plaintiff did not report the housing allowance separately on his W-2 after 2000, that was only because in 2001, the government modified the Form W-2, and there was no longer a place to break out the "Benefits" included as compensation in Box 1. The Committee further noted that Plaintiff reduced his taxable income on his U.S. income tax return each year by the maximum amount permitted which was attributable to his housing allowance, treating it separately from his foreign earned income.

On November 3, 2009, Plaintiff filed the instant lawsuit under § 502(a) of the Employee Retirement Income Security Act of 1974 (ERISA) in the Common Pleas Court of Auglaize County, Ohio. He contends that his housing allowance must be included in the calculation of retirement benefits. The action was removed here on November 30, 2009 as presenting a federal question.

**II. Standard of Review**

Under ERISA, federal courts review a plan administrator's denial of benefits *de novo*, "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d

---

Plaintiff had been the result of a change in actuaries in 2003. Its new actuaries took compensation figures directly from electronic feeds prepared for payroll tax purposes by Minster's payroll service provider, where the old actuaries had received compensation figures manually from Minster that excluded the housing allowance.

609, 613 (6th Cir. 1998) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). When a plan administrator has discretionary authority to determine benefits, the Court will review a decision to deny benefits under "the highly deferential arbitrary and capricious standard of review." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). Plaintiff concedes that the Retirement Committee's decision in this case is subject to review under the "arbitrary and capricious" standard. See Doc. 24 at 1-2.

The arbitrary and capricious standard "is the least demanding form of judicial review of administrative action." *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). Under the arbitrary and capricious standard, the plaintiff has the burden of proof to show that the decision of the administrator was arbitrary and capricious. *Rochow v. Life Ins. Co. of N. Am.*, 482 F.3d 860, 865 (6th Cir. 2007). When applying this standard, "the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Williams*, 227 F.3d at 712 (internal citations and quotations omitted). "The ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc*., 313 F.3d 356, 362 (6th Cir. 2002). Moreover, where any ambiguity exists, courts must "grant plan administrators who are vested with discretion in determining eligibility for benefits great leeway in interpreting ambiguous terms," so long as that interpretation is rational. *Moos v. Square D Co.*, 72 F.3d 39, 42 (6th Cir. 1995).

The arbitrary and capricious standard of review "is not, however, without some teeth." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (quoting *Cozzie v.*

*Metro. Life Ins. Co.*, 140 F.3d 1104, 1107-08 (7th Cir. 1998)). "Merely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005).

**III. Discussion**

Plaintiff contends that the Committee's interpretation of the Plan was "arbitrary and capricious" for three primary reasons. First, he argues that the Committee ignored the Plan's "unambiguous language" in interpreting the Plan phrase "regular monthly rate of earnings as reported for Form W-2 purposes" to exclude the housing allowance. He also contends that, even assuming the Plan language is ambiguous, the Committee acted in an "arbitrary and capricious" manner in interpreting that language under an "inherent conflict of interest." Neither of these arguments is well taken.

It is settled that, under the arbitrary and capricious standard, the Plan administrator is given deference in interpreting "ambiguous and general terms of the Plan." *Jones v. Metro Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). Plaintiff contends that the Plan language "regular monthly rate of earnings as reported for Form W-2 purposes" is unambiguous, and covers the housing allowance. In support, he cites dictionary definitions of "earnings" and "regular." "Earnings," in Plaintiff's view, means "revenue gained from labor or services, from the investment of capital, or from assets," Doc. 24 at 17 (citing Black's Law Dictionary 548 (8th ed. 2004)), and is broader than the terms "wages" or "salary." Plaintiff defines the term "regular" as "steady . . . in occurrence; not subject to unexplained or irrational variation; returning or recurring at stated or

7

fixed times or uniform intervals." *Id*. (citing Webster's New International Dictionary 2099 (2d ed. 1950). Finally, Plaintiff notes that the housing allowance was included in the total for "wages, tips, [and] other compensation" on his Form W-2.

The Court, however, finds that the phase "regular monthly rate of earnings as reported for Form W-2 purposes" is indeed ambiguous. Plaintiff contends that, because the housing allowance was "paid at a regular monthly rate" by Minster, it was part of his "regular monthly earnings." But the phrase "regular" would be redundant with "monthly" if it were interpreted to refer only to the intervals at which Plaintiff received compensation. And while the housing allowance was "regular" in the sense that it was paid on a regular monthly basis, it was not "regular" in the sense that it was, by Plaintiff's own admission, a variable amount dependent entirely on the actual housing costs incurred by Plaintiff. Thus, it was the only item listed on Plaintiff's compensation package as "Paid in Kind," meaning payment in goods or services rather than money. While the housing allowance was included in "wages, tips, [and] other compensation" on Box 1 of Plaintiff's W-2, it was marked in Box 12, for "Benefits included in Box 1," from 1996 until 2000, after which the Form W-2 no longer included a clear area to break out benefits included in the wages box. Thus, the Court finds that the Plan language is ambiguous as to whether the housing allowance is properly encompassed in "regular monthly rate of earnings as reported for Form W-2 purposes."

The Committee's interpretation of that phrase to exclude the housing allowance must therefore be upheld if the record establishes a reasonable basis or "reasoned explanation" for its decision. *Moon*, 405 F.3d at 379. The Court finds that the Committee's August 7, 2009 opinion (AR 00154-159) provides such a "reasoned explanation" that is adequately supported by the

8

record. The Committee pointed to several cogent reasons for finding that the housing allowance was not included: 1) it was listed as "Paid in Kind," and not assigned a dollar amount, on itemized lists of Plaintiff's compensation package; 2) it was not paid to him through payroll and was reported to him solely for payroll tax purposes, as reflected in the August 1997 memorandum he received (AR 00182-183); 3) it was listed in Box 12 of his Form W-2 as a "benefit included in Box 1," separately from "wages, tips, [and] other compensation" (AR 00173-178); 4) it was based on the actual rent incurred by Plaintiff; and 5) Plaintiff himself deducted the amount of his housing allowance on his U.S. income tax return, treating it differently from his foreign earned income. Although there are reasonable arguments to be made for a competing interpretation of the Plan language, the Court finds that there is a reasonable basis for excluding the housing allowance from the definition of "Monthly Earnings."

Plaintiff contends that the Committee has a conflict of interest, and that this tends to invalidate its interpretation of the Plan's provisions. The U.S. Supreme Court has held that where "a plan administrator both evaluates claims for benefits and pays benefits claims," a conflict of interest exists. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). Because the members of the Retirement Committee, in addition to being appointed by Minster, are all officers of Minster, a conflict of interest exists in this case. But the *Glenn* Court recognized that many ERISA plan administrators have both evaluation and payment functions, and are granted discretionary authority over both. *Id*. at 116. Thus, the Court emphasized that "a deferential standard of review" continues to apply even where there is a conflict, and that courts should not "create special burden-of-proof rules" to address such conflicts. *Id*. Instead, a conflict should serve as only one consideration among many case-specific factors. *Id*. at 117. For example, a

9

conflict "should prove more important" in "cases where an insurance company administrator has a history of biased claims administration." *Id.*

Recognizing this, Plaintiff attempts to bolster his "conflict-of-interest" argument with evidence that the Committee's interpretation creates unjustifiable inconsistencies between the treatment of his housing allowance and "other employment revenue" he derived, such as his Commodities and Services Allowance. But the Court finds that there was a reasonable basis for treating the Commodities and Services Allowance different from the housing allowance. The Commodities and Services Allowance was defined by Minster as "an amount paid to the foreign service employee when the costs of commodities and services in the host location exceed the costs that the employee would normally incur in the home country." Thus, it was analogous to a cost of living adjustment, which most employees receive annually as an increase in salary. Further, the Commodities and Services Allowance did not vary on a monthly basis; was not demarcated "Paid in Kind" on the itemization of Plaintiff's compensation but instead given a specific dollar amount; was not tied to actual expenses incurred; and was not listed in Box 12 on Plaintiff's Form W-2. This provides an adequate basis for the Committee to count the Commodities and Services Allowance as part of Plaintiff's "Monthly Earnings," but to exclude the housing allowance from that total.

Moreover, the Court declines to give dispositive weight to the Committee's conflict of interest. Plaintiff has proffered no evidence that the Committee has a history of biased claims administration. Indeed, it appears from the record that the Committee has acted consistently with respect to similarly-situated retirees in its benefits determinations. Further, as noted above, the Committee has put forward a reasonable and consistent justification for its interpretation that is

supported by record evidence. The facts of this case thus show that the conflict of interest was not a substantial factor in the benefits determination in this case.

**IV. Conclusion**

For the foregoing reasons, Defendant's motion for judgment on the administrative record (Doc. 25) is granted, and Plaintiff's (Doc. 24) denied. The case is closed.

IT IS SO ORDERED.

    s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE